## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MATTHEW NOBLE,** *et al.* | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 1:22-cv-01206-CRC** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
### OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Plaintiffs are thirteen individuals who allege that on four separate days in March 2022 they attempted to drive from Maryland to the District of Columbia so that they could engage in protected First Amendment activity.  Plaintiffs contend that the Metropolitan Police Department (MPD) thwarted their efforts by blocking all traffic from entering the District from certain exits on certain highways in violation of their procedural due process rights, equal protection rights, First Amendment rights, and right to interstate travel.  Plaintiffs further allege that Defendant District of Columbia should be held liable for those violations because MPD acted pursuant to an official policy or custom.  Plaintiffs' claims should be dismissed because the Court lacks subject matter jurisdiction to hear their claims and because Plaintiffs have failed to state a claim for relief.

First, Plaintiffs lack standing because they have failed to allege that their purported injury was caused by the District or that a favorable decision would redress their injury.  The lynchpin of Plaintiffs' theory is the claim that MPD blocked any and all efforts by Plaintiffs to enter the District.  But the allegations in the Complaint plainly do not support that assertion.  While

Plaintiffs allege that MPD blocked a small number of exits on certain highways, they ignore the incontrovertible fact that there are dozens of roads leading into the District that were *not* allegedly blocked by MPD.  To the extent Plaintiffs suffered any injury flowing from their purported inability to protest in the District, MPD's closure of a small number of highway exits did not, and could not have, caused Plaintiffs' injury, and for the same reason, compensatory or nominal damages would not redress their injury.  Even assuming that Plaintiffs have standing to assert claims for past injuries, Plaintiffs lack standing to pursue prospective relief because they do not allege a real, immediate threat of future injury.

Second, Plaintiffs fail to allege a violation of their procedural due process rights because they have not alleged the deprivation of their First Amendment rights or right to interstate travel. Even if Plaintiffs had alleged such a deprivation, they received notice and an opportunity to be heard.  The District's policies and procedures concerning First Amendment activities are publicly available and, to the extent a certain route into the city was related to their protected activity, they had the opportunity to request a permit to use the highway for that purpose.

Third, Plaintiffs fail to allege a violation of their equal protection rights because they have not alleged that MPD has a policy of treating Plaintiffs differently than others who are similarly situated.  And even if Plaintiffs had alleged some differential treatment, the erection of temporary blockades is rationally related to the District's interests in protecting the flow of traffic and public safety.

Fourth, Plaintiffs fail to allege a violation of their First Amendment rights because Plaintiffs do not identify any protected First Amendment activity affected by the blockades. And, even if they had, the prohibition on access to certain roads at certain times is a reasonable time, place, and manner restriction.

Fifth, Plaintiffs fail to allege a violation of their right to interstate travel because it is well-established that minor disruptions or delays in travel, especially those involving only one mode of transportation, do not offend the Constitution as a matter of law.

Finally, even assuming that Plaintiffs' rights were violated, Plaintiffs fail to allege that the violations were caused by an official policy. While Plaintiffs repeatedly refer to MPD's "blockade policy," that policy appears to be *sui generis* because Plaintiffs fail to identify any actual written policy pursuant to which MPD was acting, nor do they identify any prior examples of the blockade policy being implemented. Because the Complaint lacks any viable theory of municipal liability, Plaintiffs' claims should be dismissed for that reason as well.

## BACKGROUND

### I. Freedom Convoy and the People's Convoy

On January 28, 2022, Canadian truckers who were part of a self-described Freedom Convoy converged on Ottawa to protest Canadian policies related to COVID-19.[1] At the time, Prime Minister Justin Trudeau "dismissed" the convoy as a "fringe minority."[2] However, a week later, Ottawa declared a state of emergency because of "the serious danger and threat to the safety and security of residents posed by the ongoing demonstrations."[3] The reported actions of the protestors included "large-scale roadblocks, shooting off fireworks, [and] driving on sidewalks."[4] The protest lasted for nearly three weeks, ending only after police cleared the

---

[1] Amanda Coletta and Adela Suliman, *A self-described 'Freedom Convoy' of Canadian truckers opposed to vaccine mandate arrives in Ottawa*, Wash. Post, Jan. 28, 2022, at 1, 2022 WLNR 2820805.

[2] *Id*.

[3] Amanda Coletta, *Ottawa declares 'state of emergency' amid continuing blockades and raucous protests over covid measures*, Wash. Post, Feb. 5, 2022, at 1, 2022 WLNR 3673996.

[4] *Id*.

streets using pepper spray, stun grenades, and other anti-riot weapons.[5]  More than 190 people

were arrested.[6]

On February 9, 2022, it was reported that the U.S. Department of Homeland Security

(DHS) issued a bulletin, warning law enforcement agencies that similar actions could take place

in the United States, including in the District at President Biden's State of the Union address on

March 1.[7]  DHS warned that "if hundreds of trucks converge in a major metropolitan city, the

potential exists to severely disrupt transportation, federal government operations, commercial

facilities, and emergency services through gridlock and potential counterprotests."[8]  Days later,

Senator Rand Paul encouraged protestors to come to the District to "clog up" the city.[9]

On February 24, truckers inspired by the protests in Ottawa reportedly formed a

"People's Convoy" that left California with the intent of heading to the District.[10]  One report

stated that approximately 1,000 vehicles were part of the send-off.[11]  On March 3, members of

the People's Convoy began arriving in Hagerstown, MD; at that time, organizers reportedly

confirmed they had "no plans to go into D.C.," but were instead intending only to circle the

---

[5]    Miriam Berger, *Police in control of nearly all Ottawa streets after dispersing protestors*, Wash. Post, Feb. 21, 2022, at 1–2, 2022 WLNR 5377577.

[6]    *Id*.

[7]    Amanda Coletta, *et al.*, *Canada's capital is jammed, its border crossings are blockaded, and there's no end in sight*, Wash. Post, Feb. 9, 2022, at 1, 2022 WLNR 4045217.

[8]    *Id*.

[9]    Timothy Bella, *Rand Paul urges truckers to disrupt Super Bowl and come to D.C.: 'I hope they clog up cities'*, Wash. Post, Feb. 12, 2022, at 1, 2022 WLNR 4486283.

[10]    Ellie Silverman, *et al.*, *Convoys of protestors set sights on D.C. region*, Wash. Post, Feb. 24, 2022, at 1–2, 2022 WLNR 5711457.

[11]    *Id*.

beltway.[12]  Certain protestors, however, apparently wanted to take a more aggressive approach

and emulate Canadian protestors who blocked highways for days.[13]  On March 7 and 8, it was

again reported that organizers of the People's Convoy had no intent to enter the District, but that

not all members of the convoy agreed with that approach.[14]

On March 15, instead of simply circling the city on the beltway, the convoy entered the

District via the 14th Street Bridge on I-395, and continued to I-695 before crossing the Anacostia

River and returning to the beltway.[15]  One organizer of the convoy reportedly stated, "Today

we're getting right next to their walls.  We're not going to go in and throat-punch them yet, even

though I know we would all love to do that."[16]  In response, MPD closed certain exits at certain

locations.[17]  At the same time, the National Park Service was working with the convoy to

identify available dates and locations for a protest on the National Mall, although convoy

organizers ultimately withdrew their permit application.[18]

---

[12]     Ellie Silverman and Peter Hermann, *'Freedom Convoy' spinoff aims for D.C. region this weekend*, Wash. Post, Mar. 3, 2022, at 1, 2022 WLNR 6523797.

[13]     Ellie Silverman, *et al.*, *Convoy circles the Beltway*, Wash. Post, Mar. 7, 2022, at 1–3, 2022 WLNR 6789539.

[14]     Ellie Silverman, *et al.*, *'People's Convoy' organizers meet with senators amid pandemic-related demonstrations*, Wash. Post, Mar. 7, 2022, at 1–2, 2022 WLNR 6850176; Ellie Silverman, *et al.*, *Convoy members secure meeting with GOP senators*, Wash. Post, Mar. 8, 2022, at 1–3, 2022 WLNR 7040405.

[15] Ellie Silverman, *et al.*, *In a first since convoy's arrival, truckers drive through D.C.*, Wash. Post, Mar. 15, 2022, at 1–3, 2022 WLNR 8114488.

[16]     *Id*.

[17]     *Id*.

[18]     *Id*.

On March 16, the convoy again entered highways in the District, and MPD reportedly closed certain exits "to keep traffic moving safely."[19]  Despite MPD continuing to block certain highway exits into the District, on March 17, many convoy members reportedly entered downtown and engaged in a variety of activities, including sightseeing.[20]

## II.   First Amendment Assemblies in the District

For those individuals who would like to engage in First Amendment activity, the District has detailed procedures setting forth the process for doing so.

### A.   First Amendment Rights and Police Standards Act of 2004.

The First Amendment Rights and Police Standards Act of 2004 declares that the policy of the District of Columbia is to permit "peaceful First Amendment assemblies on [its] streets, sidewalks, and other public ways, and in [its] parks" conducted "for the purpose of persons expressing their political, social, or religious views."  D.C. Code § 5-331.02–.03.  This policy also provides that First Amendment assemblies are "subject to reasonable restrictions designed to protect public safety, persons, and property, and to accommodate the interest of persons not participating in the assemblies to use the streets, sidewalks, and other public ways to travel to their intended destinations, and use the parks for recreational purposes."  *Id*. § 5-331.03.  The Act directs MPD to "recognize and implement" this policy when enforcing any restrictions on First Amendment assemblies.  *Id*. § 5-331.04(a).  While MPD "may enforce reasonable time, place, and manner restrictions," *id*. § 5-331.04(b), no such restriction "shall be based on the content of the beliefs expressed or anticipated to be expressed during the assembly," *id*.

---

[19]     Ellie Silverman, *et al.*, *Police divert 'People's Convoy' away from downtown*, Wash. Post, Mar. 16, 2022, at 1, 2022 WLNR 8245940.

[20]     Ellie Silverman and Karina Elwood, *Some 'People's Convoy' drivers splinter off into downtown and the Mall*, Wash. Post, Mar. 17, 2022, at 1–2, 2022 WLNR 8371535.

§ 5-331.03(c).  In its implementing regulations, MPD has likewise prohibited any such restriction based on content.  24 DCMR § 705.4.

The First Amendment Rights Act establishes an application process for a planned First Amendment assembly.  D.C. Code § 5-331.05.  "The purpose of the notice and plan approval process is to avoid situations where more than one group seeks to use the same space at the same time and to provide the MPD and other District agencies the ability to provide appropriate police protection, traffic control, and other support for participants and other individuals."  *Id*. § 5-331.05(b).  A person or group wishing to conduct an assembly is not required to apply for approval of an assembly plan in certain specified situations, including when "the person or group reasonably anticipates that fewer than 50 persons will participate" in an assembly that will not occur on a District street.  *Id*. § 5-331.05(d)(2).

The First Amendment Rights Act gives the Chief of Police exclusive authority to grant, deny, or revoke an assembly plan.  *Id*. § 5-331.06(a).  It requires the Chief to inform the applicant, in writing, of the reasons for any decision to deny or revoke an assembly plan or to "[a]pprove an assembly plan subject to time, place, or manner restrictions that the applicant has advised the Chief . . . are objectionable to the applicant."  *Id*. § 5-331.06(c).  An applicant may appeal such decision to the Mayor, who "shall make a decision on appeal expeditiously and prior to the date and time the assembly is planned to commence," and "shall explain in writing the reasons for the decision."  *Id*. § 5-331.06(d).

## B.   Standard Operating Procedure for First Amendment Assemblies

Under MPD's Standard Operating Procedure for First Amendment Assemblies (SOP), MPD "provides trained personnel to respond to the scene of First Amendment assemblies in our city in order to preserve peace while protecting the constitutional and statutory rights of people

to assemble peacefully and exercise free speech."[21]   At planned First Amendment assemblies

that MPD "is aware of in advance, either through the submission of a permit request or other

means that allow for the advance planning of resources and response procedures," the Chief of

Police is required to "designate command officials to serve as area or incident commanders at

various sites to manage events." *Id.* at 4.  The SOP further states that "[i]n order to perform its

mission of protecting the rights of demonstrators, counter-demonstrators, and non-demonstrators

alike, it is the policy of the MPD to engage in advance planning to facilitate demonstrations

where the Department is provided advance notification through the permit application process or

learns of a planned First Amendment assembly." *Id.*  The SOP also lists criminal charges that

may result from First Amendment assemblies, including Crowding, Obstructing, or

Incommoding, D.C. Code § 22-1307(a) ("It is unlawful for a person, alone or in concert with

others, to crowd, obstruct, or incommode . . . the use of any street . . . ") and Obstructing Public

Highway, D.C. Code § 22-3321 (It is unlawful for a person to "obstruct the free use of any

public highway" without proper authority.).

## III.   __Plaintiffs' Complaint__

Plaintiffs do not allege that they were part of, or participated in, the People's Convoy.

Compl. at 1–2, ¶ 21 [1].  Rather, Plaintiffs contend that they were part of a separate and

independent group dubbed "13 trucks for 13 fallen soldiers" that traveled to the District—on

apparently the exact same days and times as the People's Convoy—both to protest COVID-19

related policies and to honor thirteen service members who lost their lives in Afghanistan on

August 26, 2021.  *Id.*  Plaintiffs allege that on four separate days they attempted to enter the

---

[21]     MPD SOP 16-01, *Handling First Amendment Assemblies and Mass Demonstrations* at 3
(Dec. 13, 2016), *available at* https://go.mpdconline.com/GO/SOP_16_01.pdf.

District using certain exits off of either I-395, I-295, or I-695 only to be prevented from exiting those highways by MPD blockades.  Compl. ¶¶ 23–27, 32.

More specifically, Plaintiffs contend that, on March 14, 2022, they traveled (apparently eastbound) on I-395 "toward[ ] the District" where they allegedly "encountered MPD officers" who denied them access to the city.  *Id.* ¶ 23.  Plaintiffs do not allege that I-395 was completely closed (*e.g.*, that they were somehow prohibited from traveling along I-395 onto another one of the area's many other major roadways) or that they attempted to access the city limits by any other route; nor do the specify which of the numerous exits into D.C. along I-395 were allegedly blocked that day.  *See id.*  Plaintiffs further contend that, the following day, they attempted to access the District via I-295, but were redirected onto MD-201, and proceeded away from the city.  *Id.* ¶¶ 25–26.  MD-201 is itself a route into the District (via US 50/ New York Ave.), but Plaintiffs do not allege they attempted to enter D.C. via that route—or any other.  *See id.*  The next day—March 16—Plaintiffs apparently attempted to enter the District via I-695 (eastbound), but encountered MPD blockades on at least two (of four) major exits from I-695 toward downtown.  *See id.* ¶¶ 27–31.  Again, Plaintiffs do not suggest they tried any other exits on I-695, or any of the entry points to the city from I-395—on which they necessarily would have traveled to reach I-695—*or* any other entrance to downtown off of any other roadway.  *See id.*  Plaintiffs allegedly made a "final attempt" two days later (March 18), but the Complaint provides no details at all about what they "attempt[ed]."  *Id.* ¶ 32.

Plaintiffs assert that MPD's actions violated their rights to interstate travel, due process, equal protection, and free speech under the First, Fifth, and Fourteenth Amendments.  *Id.* ¶¶ 36–103.  Plaintiffs seek declaratory and injunctive relief, as well as nominal, compensatory, and punitive damages and attorney's fees and costs.  *Id.* at 18–19.

## LEGAL STANDARDS

### I.   Motion to Dismiss Under Rule 12(b)(1)

Because federal courts are courts of limited jurisdiction, the law presumes that "a cause lies outside this limited jurisdiction." *Rasul v. Bush*, 542 U.S. 466, 489 (2004) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (U.S. 1994)). Thus, on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating that the court's jurisdiction is proper by a preponderance of the evidence. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008). "[S]ubject matter jurisdiction is, of necessity, the first issue for an Article III court." *Loughlin v. United States*, 393 F.3d 155, 170 (D.C. Cir. 2004). In determining whether it has jurisdiction, a district court may consider material outside of the pleadings. *See, e.g.*, *Halcomb v. Office of the Senate Sergeant-At-Arms*, 563 F. Supp. 2d 228, 235 (D.D.C. 2008). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### II.   Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679. "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 557).

In evaluating a motion under Rule 12(b)(6), the Court "may consider … the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Laughlin v. Holder*, 923 F.Supp.2d 204, 209 (D.D.C. 2013).

## ARGUMENT

**I.** **Plaintiffs Lack Standing To Pursue Claims for Past Injuries Because They Fail To Allege Causation or Redressability.**

Plaintiffs bear the burden of proving that the Court has jurisdiction—of which standing to sue is a central component—to hear their claims. *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 89 (D.D.C. 2013). The "irreducible constitutional minimum" of standing consists of: (1) injury-in-fact; (2) causation; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Causation requires "that the injury be fairly traceable to the defendant's challenged conduct." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) (citing *Lujan*, 504 U.S. at 560–61). Redressability requires that the injury can be remedied "by a favorable decision." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). At the motion to dismiss stage, while the Court must accept facts alleged in the Complaint as true, it "do[es] not assume the truth of legal conclusions, nor does it accept inferences that are unsupported by the facts set out in the complaint." *Baz v. U.S. Dep't of Homeland Sec.*, Civil Action No. 18-1013, 2019 WL 5102827, at *3 (D.D.C. Oct. 11, 2019) (brackets omitted).

Even assuming that Plaintiffs can establish injury-in-fact, they have failed to plausibly allege that the District's conduct caused their injury or that a favorable decision would redress their injury. Plaintiffs' alleged injury is their inability to drive into the District on four consecutive days in March; their Complaint is rife with conclusory assertions that MPD was responsible for their repeated failures, *see e.g.*, Compl. ¶ 41, but their factual allegations do not

11

plausibly support the causal nexus they urge.  To be sure, it cannot be reasonably disputed—and therefore the Court may take judicial notice[22] of the fact—that there are dozens of roads leading into the District of Columbia, many of which are specifically designated as "citywide truck and bus routes."[23]  By  Plaintiffs' own account, they attempted to access downtown using only one route on each of three days—On March 14, I-395; on March 15, I-295; and on March 16, I-695. *See* Compl. ¶¶ 23–31.  And they provide no details at all about their "final attempt" on March 18. *See id.* ¶ 32.

Even assuming Plaintiffs attempted to use, *and* were in fact blocked by MPD from using, *every* exit along the single route on which they traveled each day—facts they do not, in fact, allege, *see supra* at 8–9 (identifying material facts not alleged by Plaintiffs)—they still would have had numerous other routes available to them—routes that the Complaint nowhere suggests were also blocked by MPD officers.  In other words, Plaintiffs have, at best, alleged that the District had obstructed a small number of exits into the city at any given time.   While the closure of a small number of exits into the city may cause individuals to take a different route than the one they intended to take, it certainly would not "prohibit" them from entering the city, full stop. Nor would the government actions with which Plaintiffs take issue prevent anyone from engaging in protected activity after entering the city.

---

[22]    "A federal court may take judicial notice of 'a fact that is not subject to reasonable dispute' if it ... 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting Fed. R. Evid. 201(b)).

[23]    The District publishes a wealth of information concerning how trucks and other commercial vehicle can and should travel into and throughout the city, including a comprehensive map of "designated citywide truck and bus routes," on the District Department of Transportation's website at https://ddot.dc.gov/service/commercial-vehicles (last visited, July 15, 2022).

Similarly, because Plaintiffs at all times had the ability to enter the District and engage in protected activities, their requested relief would do nothing to redress their purported injury. Accordingly, Plaintiffs have failed to sufficiently allege standing under Article III and their claims should be dismissed for lack of jurisdiction.

## II.   **Plaintiffs Lack Standing To Pursue Claims for Prospective Relief Because They Fail To Allege a Real and Immediate Threat That Any Past Injuries Are Likely To Occur Again in the Future.**

"[W]hen [plaintiffs] seek[ ] prospective declaratory or injunctive relief, allegations of past harms are insufficient." *Nat'l Sec. Counselors*, 931 F. Supp. 2d at 91.  Instead, Plaintiffs must allege that they are "likely to be subjected to the policy again."  *Id*.  "This threat must be 'real and immediate,' or alternatively, 'realistic' in nature."  *Id*. (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 1983)).  A court "may not hear a claim for equitable relief that rests solely on a 'speculative claim of future injury.'"  *Tipograph v. Dep't of Justice*, 146 F. Supp. 3d 169, 175 (D.D.C. 2015) (quoting *Lyons*, 461 U.S. at 111); *accord Citizens for Responsibility and Ethics in Washington (CREW) v. U.S. Dep't of Homeland Security*, 527 F. Supp. 2d 101, 106 (D.D.C. 2007) (granting motion to dismiss when alleged future injuries were "too speculative and remote" to support standing to seek prospective relief).

Here, Plaintiffs seek prospective injunctive and declaratory relief.  Compl. at 18.  But Plaintiffs fail to allege any concrete plans to enter the District for the purpose of protesting in the future.  Plaintiffs allege only that they "have maintained the intent, and presently do maintain the intent, to return to the District of Columbia for lawful purposes and to exercise their First Amendment freedoms."  *Id*. ¶ 33.  Those "some day" allegations are too "speculative and remote" to establish standing for prospective injunctive or declaratory relief.  *See CREW*, 527 F. Supp. 2d at 106; *accord Baz*, 2019 WL 5102827, at *5 (explaining that "'some day' intentions—

without any description of concrete plans, or indeed even any specification of when the some day

will be—do not support a finding of the 'actual or imminent' injury that [the Court] requires").

III.   **Plaintiffs Fail To Allege a Violation of Their Procedural Due Process Rights.**

In Count 1, Plaintiffs assert that the unidentified "blockade policy" violated their

procedural due process rights because (1) it deprived them of their right to engage in First

Amendment protected activity, (2) it deprived them of their right to interstate travel, and (3) the

unidentified blockade policy is not defined with sufficient definiteness such that it is

unconstitutionally vague.  Compl. ¶¶ 36–64.  Plaintiffs also include in Count 1 an argument that

the unidentified blockade policy is unconstitutionally overbroad.  *Id*. ¶ 49.  None of those four

theories have merit.

Initially, Plaintiffs' overbreadth theory in Count 1 is faulty because the overbreadth

doctrine applies to claims under the First Amendment, not procedural due process.  *Lutz v. City

of York*, 899 F.2d 255, 270–71 (3d Cir. 1990) (explaining that "the overbreadth doctrine has

never been recognized outside of the context of the First Amendment"); *United States v.

Williams*, Crim. Action No. 21-618, 2022 WL 2237301, at *6 (D.D.C. June 22, 2022)

("Although the overbreadth and vagueness doctrines are related, they are distinct.").  Even if that

were not the case, Plaintiffs' overbreadth claim would fail for the same fundamental reason as

their vagueness claim:  Both depend on the existence of a policy that can be analyzed for

overbreadth or vagueness, and  Plaintiffs have failed to identify *any* policy that actually exists

(written or unwritten.[24]

---

[24]    Even if a blockade policy did exist, on its face, it would concern the movement of traffic,
not speech, and "[r]arely, if ever, will an overbreadth challenge succeed against a law or
regulation that is not specifically addressed to speech or to conduct necessarily associated with
speech."  *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

Plaintiffs' remaining due process arguments—that they were deprived of their rights to free expression and interstate travel—fare no better. "The three basic elements of a procedural due process claim are (1) a deprivation, (2) of life, liberty, or property, (3) without due process of law." *2910 Georgia Ave. LLC v. District of Columbia*, 234 F. Supp. 3d 281, 315 (D.D.C. 2017). As explained below, *see* Sections V and VI, Plaintiffs have failed to allege that they were deprived of either their First Amendment rights or their right to interstate travel.

Even assuming that a blockade policy did exist and that its application did transgress Plaintiffs' rights, Plaintiffs had adequate process available to them to challenge the alleged deprivation. Plaintiffs received notice by virtue of the District's policies and procedures concerning First Amendment activity being publicly available, and those policies and procedures provide ample opportunity to be heard with regard to First Amendment activity. *See supra* at 6–8 (Background). But Plaintiffs fail to allege they took advantage of that opportunity. It is well-established that "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." *Chavis v. Garrett*, 419 F. Supp. 3d 24, 38 (D.D.C. 2019) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). If Plaintiffs believed that using a preferred route into the District was essential to their protected activity, they could have sought a permit. They did not. Given their failure to take advantage of the remedies available to them, they cannot now complain about a lack of due process.

IV.     **Plaintiffs Have Failed to State a Claim Under the Equal Protection Clause Because They Have Not Alleged that MPD Has a Policy of Treating Plaintiffs Differently Than Other Who Are Similarly Situated, and MPD's Erection of Temporary Blockades Have a Rational Basis.**

Plaintiffs claim that MPD's actions to block their trucks from accessing some District streets violates the Equal Protection Clause because plaintiffs allege that the District "allow[s]

others to enter the District to engage in First Amendment protected activity."  Compl. ¶ 66.  But

Plaintiffs' equal protection claim fails because, crucially, they have not plausibly alleged "that

the government intentionally treated [them] differently from others who were similarly situated."

*BEG Invs., LLC v. Alberti*, 85 F. Supp. 3d 13, 34 (D.D.C. 2015); *see United States v. Bell*, 506

F.2d 207, 221–22 (D.C. Cir. 1974) ("That different persons receive different treatment at the

hand of Government does not, without more, demonstrate constitutional inequality.").

Moreover, even if Plaintiffs had showed that they are treated differently than others who are

similarly situated, there is a rational basis for the alleged differential treatment.

  A.  **<u>Plaintiffs Fail to Allege That They Are Similarly Situated to Others</u>**
     **<u>Attempting to Access District Streets.</u>**

    Plaintiffs do not allege any facts that, if true, would show that they are similarly situated

to others who received more favorable treatment.  Plaintiffs vaguely allege that there are "others"

who are "allow[ed] to enter the District to engage in First Amendment protected activity" while

they are denied, but Plaintiffs do not identify these individuals nor any of the circumstances

surrounding these individuals' alleged admittance to the District.[25]  Compl. ¶ 66.  Plaintiffs also

suggest that other protestors with differing viewpoints have been permitted to enter the District,

but Plaintiffs failed to identify the differing viewpoints or provide any description of a protest

that the District permitted these individuals to hold but denied to Plaintiffs—nothing on which

the Court can evaluate either whether the two groups are indeed similarly situated or whether

they were treated differently in material respects.  *Id.* ¶ 70.

---

[25]  As discussed below, *see* Section V, Plaintiffs do not allege that they intended to engage in any First Amendment activity that was affected by the blockades.

Plaintiffs similarly allege that "those who are not perceived as members of the People's Convoy" are allowed to enter the District, but Plaintiffs also provide no allegations of the circumstances surrounding the alleged differential treatment allegation; more tellingly, Plaintiffs' conclusion is contradicted by their allegations that the blockades affected all motorists' ability to access certain District roads.  Compl. ¶ 69.  In fact, Plaintiffs do not allege *any* facts that would show how they are similarly situated to these groups or even that these groups received different treatment.  Such omissions are fatal to their Equal Protection Clause claim.  *See BEG Invs., LLC*, 85 F. Supp. 3d at 33 (finding plaintiff failed to state an Equal Protection Clause claims where the complaint failed to provide any factual allegations suggesting other businesses were similarly situated); *Mpras v. District of Columbia,* 74 F. Supp. 3d 265, 271 (D.D.C.2014) (finding plaintiff's conclusory allegations of being treated differently from those "similarly situated" were insufficient to state an equal protection clause claim because the complaint did not allege any supporting facts "about who these other persons are or how they were similarly situated").

Plaintiffs' "unsupported and conclusory allegations are not enough" to make out an equal protection claim "in the absence of actual evidence of disparate treatment."  *Texas Border Coal. v. Napolitano*, 614 F. Supp. 2d 54, 65–66 (D.D.C. 2009) (citing *Bois v. Marsh*, 801 F.2d 462, 466 n.5 (D.C. Cir. 1986) (noting in equal protection context that "vague allegations, especially when unsupported by an affidavit or other evidence … are insufficient to state a claim")).  And, thus, Plaintiffs fail to allege a viable equal protection challenge.

**B.**     **Even If the District Had Treated Others Who Are Similarly Situated Differently, the District's Actions Were Rationally Related to the Legitimate Goal of Ensuring Traffic Flow and Protecting Public Safety.**

Even if Plaintiffs had adequately alleged that the District treated similarly situated individuals who were "not perceived as members of the People's Convoy" or other protestors

differently, Plaintiffs' equal protection claim would still fail as a matter of law.  *See* Compl. ¶¶ 66, 69, 70.  It is well-established that equal protection "does not require all persons everywhere be treated alike … [but rather] that the government not treat similarly situated individuals differently without a rational basis." *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999) (emphasis in original) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)).  Under this standard, Plaintiffs fail to allege a viable equal protection challenge.

Plaintiffs contend that the District's erection of temporary blockades should be subject to strict scrutiny, but Plaintiffs are wrong.  Compl. ¶ 67.  "The Equal Protection Clause provides a basis for challenging legislative classifications that treat one group of persons as inferior or superior to others, and for contending that general rules are being applied in an arbitrary or discriminatory way." *Metro. Wash. Ch., Assoc. Builders & Contractors, Inc. v. District of Columbia*, 57 F. Supp. 3d 1, 28 (D.D.C. 2014) (quotations and citation omitted).  When a challenged classification impinges on a fundamental right or targets a suspect class, it is subject to strict scrutiny. *Id.*  The particular right asserted here—the right to access particular streets at particular times—has not been determined to be fundamental, in a constitutional sense, by the Supreme Court or the D.C. Circuit.[26]  And plaintiffs do not allege that truck drivers who are "assumed to be part of the People's Convoy" are a suspect class.  *See* Compl. ¶ 69; *generally* Compl.  Consequently, even if Plaintiffs were treated differently, the classification need only bear a "rational relation to some legitimate end." *Romer v. United States*, 517 U.S. 620, 631 (1996); *see also Hettinga v. United States*, 677 F.3d 471, 478 (D.C. Cir. 2012) ("A statutory

---

[26]     Plaintiffs claim that interstate travel and free speech are fundamental rights, but–for the reasons described below, *see* Sections V and VI–those rights are not implicated here.  Compl. ¶ 67.

classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.") (internal quotation marks and citations omitted).

"Even at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'" *Hettinga*, 677 F.3d at 479 (quoting *Dumaguin v. Sec'y of Health & Human Servs.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994)). "Rational basis review is thus 'highly deferential,' and it 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Metro. Wash. Ch.*, 57 F. Supp. 3d at 28 (internal citations omitted). "Where no suspect classification is involved, the government is 'entitled to a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality.'" *Frazier v. D.C. Dep't of Emp't Servs.*, 229 A.3d 131, 141 (D.C. 2020) (internal quotation marks and citation omitted). Plaintiffs here simply cannot overcome this presumption of rationality because it is conceivably rational that the MPD erected blockades to respond to a known threat that members of the People's Convoy would attempt to disrupt traffic and create public safety concerns. *See supra* at 3–6 (Background). Given that traffic flow and public safety are significant public concerns, it is certainly rational for the District to take measures it believed would address the threat from the People's Convoy entering the District. Plaintiffs have failed to meet their burden here and, as a result, have failed to state a claim under the Equal Protection Clause.

**V.     Plaintiffs Fail To State a Claim Under the Free Speech Clause Because Plaintiffs Have Not Identified Any First Amendment Activity at Issue and, Even If They Had, the District's Actions Withstand Constitutional Scrutiny.**

Plaintiffs allege that the District's temporary blockade of some streets that Plaintiffs wished to access constitutes an infringement of their First Amendment rights.  Compl. ¶¶ 78–99. But Plaintiffs have failed to state a claim under the First Amendment.  As a threshold matter, Plaintiffs do not allege that they were prevented from protesting or engaging in any other First Amendment activity in the District, thereby failing to implicate the First Amendment at all.  But, even if Plaintiffs had alleged that their preferred route was relevant to the exercise of their First Amendment rights (which they do not), their claim would still fail because the District has the authority to impose time, place, and manner restrictions on First Amendment activities in furtherance of its goals to manage traffic and ensure public safety.

**A.     Plaintiffs Fail to Identify Any First Amendment Activity Affected by the Blockades.**

Plaintiffs note that "protests are quintessential protected expression" under the First Amendment, Compl. ¶ 82, and "public streets and roadways . . . are traditional public forums," Compl. ¶ 81.  While true, this does not help them.  Plaintiffs do not allege that they intended to engage in a protected First Amendment activity (protesting) in a traditional public forum (city streets).  On the contrary, Plaintiffs claim that they wished to travel on roads blocked by the MPD to engage in some form of protest *once they were in the District*.  *See* Compl. at 3 (Plaintiffs travelled to the District "with the intent to lawfully exercise their First Amendment rights in protest . . .  ").  And Plaintiffs' Complaint lacks any explanation of what their protest would entail if they *had* entered the District.  Perhaps Plaintiffs intended to ensnarl traffic or park their trucks in a prominent location or pass out flyers on the National Mall.  They simply do not say.  In fact, they allege only that they were not allowed to travel into the District using their

20

preferred route, but they do not contend that their preferred route had any connection or

relevance to their intended First Amendment activity once they arrived in the District.  As noted

above, *see supra* at 8–9 (Section I), Plaintiffs have not alleged that the blocked roads are the *only*

means of entering the District, and Plaintiffs have not shown why they could not engage in their

intended protest in the District after taking an alternative route into the city.

 Thus, Plaintiffs have failed to identify any activity protected by the First Amendment

that would be affected by the District's actions they challenge.  This is fatal to their First

Amendment claim.

    **B.**    **Even if Plaintiffs Had Intended to Engage in a Protected First Amendment
Activity on the Blocked Roads, the District's Temporary Blockades Would
Not Run Afoul of the First Amendment.**

Even if Plaintiffs had alleged that they intended to engage in a protected First

Amendment activity on the blocked roads, the District's temporary blockades would not run

afoul of the First Amendment.  Although, as Plaintiffs note, public streets are a traditional public

forums, Compl. ¶ 82, "[w]hen it comes to use of a public forum such as a street . . . speakers do

not have a constitutional right to convey their message whenever, wherever and however they

please."  *Christian Knights of Ku Klux Klan Invisible Empire, Inc. v. D.C.*, 972 F.2d 365, 372

(D.C. Cir. 1992); *see Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647

(1981) ("[T]he First Amendment does not guarantee the right to communicate one's views at all

times and places or in any manner that may be desired.").  Speech on streets remains "[s]ubject

to the traditional time, place, and manner restrictions."  *Richmond Newspapers, Inc. v. Virginia*,

448 U.S. 555, 578 (1980); *see, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 115–16 (1972)

(prohibiting a "demonstration . . . on a large street during rush hour" would be a reasonable time,

place, and manner restriction because "it might put an intolerable burden on the essential flow of

traffic."); *Cox v. State of La.*, 379 U.S. 536, 555 (1965) ("A group of demonstrators could not insist upon the right to cordon off a street . . . and allow no one to pass who did not agree to listen to their exhortations."). Here, the District's actions restricting access to certain roads at certain times to respond to a threatened traffic disruption, *see supra* at 3–6 (Background, explaining People's Convoy's widely publicized presence in the DC Metro area), is a reasonable time, place, and manner restriction.

Plaintiffs suggest that the Court should apply strict scrutiny when reviewing the MPD's actions temporarily blocking certain streets. Compl. ¶ 87. Not so. Under the relevant level of scrutiny, time, place, and manner restrictions will be upheld if they "are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (quoting *Ward v. Rock against Racism,* 491 U.S. 781, 791 (1989)). The District's decision to set up temporary blockades satisfies these three criteria and withstands constitutional scrutiny. *See McCullen*, 573 U.S. at 477.

First, considering to what Plaintiffs allege, what they do not, and reasonable inferences from Plaintiffs' credible facts, the District's imposition of blockades was content- and viewpoint-neutral. "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Ward,* 491 U.S. at 781 (quoting *Clark*, 468 U.S. at 293). And "a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* at 791. Plaintiffs' contention they were subject to viewpoint or content discrimination turns on their allegation that "the District has a *de facto* exemption [from its

blockade policy] . . . for protests that promote the viewpoint [Mayor Bowser] shares while discouraging others, such as Plaintiffs, from engaging in lawful and peaceful protests . . . advocating for viewpoints [Mayor Bowser] does not share."  Compl. ¶ 84.  But that is not a fact; it is a conclusion that the Court cannot accept as true unless substantiated by well-pleaded facts. And Plaintiffs fail to identify any facts surrounding these alleged protestors, including what their protests entailed, who they are, and what viewpoints they espoused.  In other words, Plaintiffs have failed to allege that others with different viewpoints received any differential treatment. Moreover, as Plaintiffs acknowledge, the blockades prevented all motorists from entering certain streets at certain times; the ability to access Plaintiffs' preferred route into the District had nothing to do with the motorists' viewpoints and MPD's imposition of temporary blockades is content- and viewpoint-neutral.  Compl. at 3; *id.* ¶ 28.

Second, the District's actions were narrowly tailored to serve a significant government interest.  Plaintiffs allege only that the District blocked some access to District streets at a particular time on particular days when there was a threat of the People's Convoy plans to wreak havoc on traffic flow in the District.  *See supra* at 8–9 (Background); Compl. at 4 (alleging that "MPD's presence was solely, proximately, and exclusively due to Plaintiffs' potential for First Amendment activity in the District of Columbia." (internal quotation marks omitted)).  Indeed, MPD's blockades were a direct reaction to a particular threat posed by the People's Convoy and aimed at protecting the traffic flow and public safety, both of which are well-established significant government interests.  *See Mahoney v. U.S. Marshals Serv.*, 454 F. Supp. 2d 21, 33 n.3 (D.D.C. 2006) (finding that "interest in maintaining a safe and convenient traffic flow" was a "significant government interest[] that [justified] reasonable time, place, and manner restrictions" when law enforcement closed access to several District streets around a high profile event);

23

*McCullen*, 573 U.S. at 486 (recognizing "the legitimacy of the government's interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks") (internal quotation marks omitted); *Cox*, 379 U.S. 536, 554–55 ("Governmental authorities have the duty and responsibility to keep their streets open and available for movement."). And MPD's decision to block traffic flow to certain streets for a limited time when there was a threat of traffic disruption is narrowly tailored to address those significant government interests.

Third, Plaintiffs had ample alternative channels of communication to express their intended message. Plaintiffs allege only that they were denied access to particular roads that provided access to the District. As discussed above, *see supra* at 20–21 (Section V.A), they establish no connection between the message they seek to convey and the access to certain streets. But even if driving on particular streets at particular times was part of Plaintiffs' intended protest, Plaintiffs could have conveyed their message in a myriad of other ways. They could have taken different roads into the District, made signs, assembled in public spaces, or passed out flyers—among countless other alternate means of expression. Plainly, the blockades had no effect on Plaintiffs' ability to convey their desired message. And the District's actions pass constitutional muster.

## VI.   **Plaintiffs Fail To Allege a Violation of Their Right to Interstate Travel.**

In Count 1, Plaintiffs allege that their inability to enter the District off of certain exits on certain highways violated their right to interstate travel. Compl. ¶ 43. That claim is specious. As many courts have held, "travelers do not have a constitutional right to the most convenient form of travel." *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991). Rather, "government conduct that does not directly and substantially 'impair the exercise of the right to free interstate movement' does not amount to a constitutional violation." *Abdi v. Wray*, 942 F.3d 1019, 1030

(10th Cir. 2019) (quoting *Saenz v. Roe*, 526 U.S. 489, 501 (1999)).  "If every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue."  *Id.*; *accord Miller v. Reed*, 176 F.3d, 1202, 1205 (9th Cir. 1999) ("Burdens placed on travel generally, such as gasoline taxes, or minor burdens impacting interstate travel, such as toll roads, do not constitute a violation of that right.").

In addition, "burdens on a single mode of transportation do not implicate the right to interstate travel."  *Miller*, 176 F.3d at 1205; *accord Owner Operator Independent Drivers Ass'n v. Penna. Turnpike Commission*, 934 F.2d 283, 295 (3d Cir. 2019).  In fact, the Second Circuit held in the context of airport security that a delay of more than a day was "a minor restriction that does not result in a denial of the right to travel."  *Torraco v. Port Auth. of New York & New Jersey*, 615 F.3d 129, 141 (2d Cir. 2010) (explaining that there was no violation of the right to interstate travel in part because plaintiff had no restrictions on his ability to drive, bus, or otherwise commute interstate).

Here, Plaintiffs allege only that they were not permitted to use the highway exits of their choice when traveling in their trucks from Maryland to the District.  Compl. ¶¶ 23–32.  At most, Plaintiffs have alleged that they experienced a brief delay when entering the District that impacted only one mode of transportation.  That contention does not plausibly allege a violation of their right to interstate travel.

## VII.   Plaintiffs Have Failed to Allege That Any Violation of Their Rights Was Caused by an Official Policy or by a Custom.

Even assuming Plaintiffs have adequately alleged a violation of their constitutional rights, their claims still should be dismissed because they have failed to allege that any violation was caused by a municipal policy of the District.  "Under 42 U.S.C. § 1983, municipalities can be

held liable for constitutional violations committed by their employees only if a plaintiff shows that the municipality is the 'moving force' behind the constitutional violation, meaning that an 'official municipal policy of some nature caused a constitutional tort.'" *Hurd v. District of Columbia*, 997 F.3d 332, 337 (D.C. Cir. 2021) (quoting *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 691 (1978)).

The D.C. Circuit has identified four ways such an official policy can be shown: (1) the municipality adopts a policy that violates the Constitution; (2) a "policy maker" within the government takes an unconstitutional action; (3) "the employees' unconstitutional actions are so consistent that they have become a custom of the municipality of which the supervising policymaker must have been aware"; or (4) "deliberate indifference" to the risk of constitutional violations. *Hurd*, 997 F.3d at 337 (quoting *Baker*, 326 F.3d at 1306). Each theory of municipal liability has its own elements and, to survive a motion to dismiss, "a plaintiff must plead the elements of the relevant type of municipal policy." *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015). Here, Plaintiffs make no attempt to establish the second or fourth theories of liability. To the extent Plaintiffs are alleging that an official policy or custom caused the alleged violations, they do not state a claim under either theory

A.   **Plaintiffs Fail to Allege an Express Municipal Policy.**

Plaintiffs repeatedly assert that the District's alleged actions were taken pursuant to a "blockade policy." *See, e.g.*, Compl. ¶¶ 47–49. However, establishing the existence of an explicit municipal policy requires Plaintiffs to show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Plaintiffs have plainly failed to identify any officially adopted blockade policy. To the extent Plaintiffs

contend that there is an unofficial, unwritten blockade policy (they do not), that contention would necessarily defeat any claim that there is an official policy.  And, even if their theory *was* that there is an unwritten blockade policy, then they would still need to show that such a policy rose to the level of custom or practice, which, as explained below, they have not done.  *See Arashiba v. City of Minneapolis*, Civil Action No. 20-cv-579, 2021 WL 3276305, at *7 (D. Minn. Jan. 21, 2021) ("Courts thus evaluate allegations of an unwritten policy under the standards used to analyze the sufficiency of a *Monell* custom claim.") (citation omitted).

**B.      Plaintiffs Fail to Allege That MPD Has a Custom or Practice of Blockading Highway Exits.**

To state a claim for liability based on a custom or practice, Plaintiffs must allege "concentrated, fully packed, precisely delineated scenarios" to support their allegations that such a policy or custom exists, *Page v. Mancuso*, 999 F. Supp. 2d 269, 284 (D.D.C. 2013) (quoting *Parker v. District of Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988)), and that the custom is "pervasive," *Tabb v. District of Columbia*, 605 F. Supp. 89, 96 (D.D.C. 2009).  Despite several conclusory references to the District's blockade custom or practice, *see, e.g.*, Compl. ¶ 47, Plaintiffs do not identify *any* other examples of the blockade policy purportedly being applied, which obviously falls far short of the necessary showing.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

Date: July 15, 2022.                                  Respectfully Submitted,

                                                                  KARL A. RACINE
                                                                  Attorney General for the District of Columbia

                                                                  CHAD COPELAND
                                                                  Deputy Attorney General
                                                                  Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Richard P. Sobiecki*
RICHARD P. SOBIECKI [500163]
PAMELA A. DISNEY [1601225]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 805-7512
Email: richard.sobiecki@dc.gov

*Counsel for Defendant*