# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MATTHEW NOBLE** *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 22-cv-1206 (CRC) |
| **DISTRICT OF COLUMBIA**, | |
| Defendant. | |

## MEMORANDUM OPINION

Plaintiffs are fifteen individuals who travelled to the Washington, D.C. area in March 2022 to protest the Biden administration's COVID-19 policies. They claim they were stymied in that effort by police roadblocks on three highways leading to D.C. They sued the District of Columbia (the "District") for alleged violations of their constitutional rights to due process, free speech, and interstate travel. After the Court dismissed their initial complaint without prejudice for lack of standing, plaintiffs amended their complaint and now allege the District violated their constitutional rights to free speech and equal protection. The amended complaint fares only slightly better than the original one did. Though plaintiffs have established standing to sue over their alleged past injuries, they have not established standing as to prospective harm and have failed to allege that the District is liable for the asserted constitutional violations. Accordingly, the Court will dismiss their amended complaint and the case.

## I.    Background

In early 2022, a group of Canadian truckers embarked on a self-described "Freedom Convoy" to protest COVID-19 vaccination mandates. The convoy ended in the capital, Ottawa, where it paralyzed downtown traffic for three weeks, leading to the declaration of a state of emergency. Scores of protesters were arrested.

On February 9, 2022, numerous media outlets reported that the Department of Homeland Security had warned local law enforcement that copycat protests were planned in the United States. Sure enough, it was reported later in the month that groups of U.S. truckers had organized a similar caravan, called the "People's Convoy," that was heading from California to Washington, D.C. One report estimated that upwards of 1,000 trucks were involved. On March 4, the convoy began arriving at a staging area in Hagerstown, Maryland. Over the next two weeks, the convoy periodically circled the city on the Interstate 495 beltway. On March 14, however, trucks reportedly entered the District via the 14th Street Bridge on Interstate 395 and continued to Interstate 695 before crossing the Anacostia River and returning to the beltway. In response, the Metropolitan Police Department ("MPD") reportedly blocked certain interstate exits into downtown D.C.[1]

The fifteen plaintiffs in this case hail from nine different states.[2] Am. Compl. ¶¶ 4–18. From a gathering point in Hagerstown, Maryland, where the People's Convoy also convened, plaintiffs allege that they unsuccessfully attempted to enter Washington D.C., in a fleet of trucks, three times in mid-March 2022. Id. ¶¶ 20, 29–44. Like the truckers in the People's Convoy, plaintiffs came to D.C.

---

[1]  The account above is drawn from reporting by the Washington Post on the "Freedom Convoy" in Ottawa and the "People's Convoy" in the D.C. area. See Amanda Coletta et al., A Self-described "Freedom Convoy" of Canadian Truckers Opposed to Vaccine Mandate Arrives in Ottawa, Wash. Post, Jan. 28, 2022; Amanda Coletta et al., Canada's Capital is Jammed, its Border Crossings are Blockaded, and There's No End in Sight, Wash. Post, Feb. 9, 2022; Miriam Berger, Police in Control of Nearly All Ottawa Streets After Dispersing Protesters, Wash. Post, Feb. 21, 2022; Ellie Silverman et al., Convoys of Protesters Set Sights on D.C. Region, Wash. Post, Feb. 24, 2022; Ellie Silverman et al., Convoy Circles the Beltway, Wash. Post, Mar. 7, 2022; Ellie Silverman et al., In a First Since Convoy's Arrival, Truckers Drive Through D.C., Wash. Post, Mar. 15, 2022; Ellie Silverman et al., Some "People's Convoy" Drivers Splinter Off Into Downtown and the Mall, Wash. Post, Mar. 17, 2022. The Court may take judicial notice of these articles. See e.g., Wash. Post v. Robinson, 935 F.2d 282, 291–92 (D.C. Cir. 1991) (taking notice of the existence of newspaper articles in the Washington, D.C. area publicizing the criminal investigation of former D.C. mayor Marion Barry). It may also consider facts outside the pleadings in assessing standing.

[2]  One of the original sixteen plaintiffs passed away before the filing of the amended complaint. See Am. Compl. at 2 n.1.

to protest the Biden administration's "continued state of emergency declaration and COVID-19 related policies." <u>Id.</u> ¶ 20.  But, apparently seeking to distinguish themselves from their fellow travelers, they also say they wished to honor thirteen service members who lost their lives in Afghanistan in August 2021.  <u>Id.</u>  As for the specifics of their planned protests, plaintiffs claim they intended to drive to the National Mall, White House, and U.S. Capitol to "speak[] with members of the public" and "voic[e] their concerns."  <u>Id.</u> ¶¶ 22, 33, 35.

According to the amended complaint, plaintiffs' fleet of trucks tried entering the District three separate times, beginning on March 14.  <u>Id.</u> ¶¶ 29–44.  On their first try, plaintiffs took Interstate 395, but were unsuccessful.  <u>Id.</u> ¶¶ 29–32.  The next day, they tried following Interstate 495 to Interstate 295 but encountered barricades at the merger between the two highways.  <u>Id.</u> ¶ 33.

On March 16, plaintiffs traveled on Interstate 695 toward the District.  <u>Id.</u> ¶ 35.  They claim they were able to enter the outer limits of the District's jurisdiction but then soon came upon a blockade of MPD vehicles on Interstate 695.  <u>Id.</u> ¶¶ 35–36.  While on the highway, plaintiffs spoke to several MPD officers, including Captain Jason Bagshaw and Sergeant Matthew Mahl.  <u>Id.</u> ¶¶ 39–40, 43.  According to plaintiffs, Sergeant Mahl told them that "695 [wa]s closed" and later stated, "my boss is going to eventually tell me to start arresting people, and I don't want to do that."  <u>Id.</u> ¶ 40. Plaintiffs also allege that during the conversation they asked whether "there [was] another way in [to D.C.] other than this exit," to which an unidentified officer replied, "There is absolutely not—not with your commercial vehicles."  <u>Id.</u> ¶ 43.  Plaintiffs tried to use the next exit leading to the District but again encountered MPD barricades.  <u>Id.</u> ¶ 41.

Having unsuccessfully tried to access their chosen locations within the District on three occasions in March 2022, plaintiffs claim they "have maintained the intent, and presently do maintain the intent" to return and exercise their First Amendment rights.  <u>Id.</u> ¶ 45.  But they have not done so

because they believe they "are under threat of arrest" should they attempt to enter the District again. Id. ¶ 47.

Plaintiffs filed a four-count complaint in May 2022.  It alleged violations of the due process clauses of both the Fifth and Fourteenth Amendments; the equal protection clauses of the Fifth and Fourteenth Amendments; the free speech clause of the First Amendment; and 42 U.S.C. § 1983, which prohibits deprivations of constitutional rights under color of state law.  Compl. ¶¶ 36–112.  All the claims were premised on the allegation that the MPD roadblocks, and a purported municipal policy or directive that led to them, violated plaintiffs' First Amendment rights and right to travel freely between states.  See id.  Plaintiffs sought declaratory relief; an injunction barring the District from preventing them from entering the city in the future; and nominal, compensatory and punitive damages, as well as attorneys' fees.  Id. at 18–19, Prayer for Relief.

The Court granted the District's motion to dismiss that complaint on the grounds that plaintiffs lacked standing, but it permitted them to file an amended complaint.  Op. & Order [ECF 15] at 9.  They did so and now allege violations of the free speech clause of the First Amendment, equal protection clauses of the Fifth and Fourteenth Amendments, and § 1983.[3]  Am. Compl. ¶¶ 50–98. The amended complaint also includes new details about plaintiffs' planned protest, see id. ¶¶ 22–26, and about their frustrated effort to reach their desired destinations in D.C. on March 16, id. ¶ 43.  The District has moved to dismiss the amended complaint, and that motion is now fully briefed.

## II.   Legal Standard

A "challenge to standing is properly raised" under Federal Rule of Procedure 12(b)(1). Ranchers-Cattlemen Action Legal Fund, United Stockgrowers of Am. v. U.S. Dep't of Agric., 573 F.

---

[3]  The Fourteenth Amendment's equal protection clause does not apply to the District, but the Fifth Amendment's due process clause imposes the same equal protection requirements on the District as the Fourteenth Amendment does on the states.  See Bolling v. Sharpe, 347 U.S. 497, 499 (1954), supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan., 349 U.S. 294 (1955).

Supp. 3d 324, 332 (D.D.C. 2021) (noting that a defect of standing is considered a "defect[] in subject matter jurisdiction" (cleaned up)).  To establish standing, the party invoking federal jurisdiction must establish (1) an "injury in fact" (2) that is "fairly . . . trace[able] to the challenged action of the defendant" and (3) that can be "redressed by a favorable decision."  Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992) (cleaned up).  At the pleading stage, plaintiffs must clearly "allege facts demonstrating each element."  Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (quoting Warth v. Seldin, 422 U.S. 490, 518 (1975)).  The Court must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff[s'] favor."  Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015).  But "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice."  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (cleaned up).

Dismissal under Rule 12(b)(6) is appropriate when the complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss for failure to state a claim, the Court must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor."  Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015).  "[D]etailed factual allegations" are not necessary, but the complaint must provide "more than labels and conclusions" or "a formulaic recitation of the elements of cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Banneker Ventures, 798 F.3d at 1129 (internal quotations omitted) (quoting Iqbal, 556 U.S. at 678).

### III.  Analysis

A.  Standing

The District contends that plaintiffs lack standing to bring their First Amendment claim (and, derivatively, their equal protection and § 1983 claims based on violations of their right to free speech) for both past injuries and prospective harm.  Though not by much, the Court finds plaintiffs have sufficiently alleged standing for past injuries.  But the amended complaint falls short in establishing standing for future harm.

*1.  Past Injuries*

As for the past injuries, the District contends that even if plaintiffs have pled injury-in-fact, they have not satisfied the causation requirement of standing.  Second Mot. Dismiss at 13.[4]  The causation requirement "concerns the link between the injury and the conduct complained of; the second is some legal wrongdoing (a bullet fired with ill intent, an investor tricked) and the first its alleged result (a loss of life or property)."  Transp. Workers Union of Am., AFL-CIO v. Transp. Sec. Admin., 492 F.3d 471, 474 (D.C. Cir. 2007) (cleaned up).  The Court must thus begin by "be[ing] very clear about what conduct and injury the [plaintiffs] put[] at issue."  Id.

As for the conduct complained of, plaintiffs challenge the MPD's erection of blockades along three highways on March 14, 15, and 16, 2022.  Am. Compl. ¶¶ 29, 33, 36–37.  They claim these blockades prohibited them from travelling *by truck* to three locations in D.C.—the National Mall, White House, and Capitol—and "speaking with members of the public and voicing their concerns"

---

[4]  Though the District also claims plaintiffs have not satisfied the redressability requirement of standing, Second Mot. Dismiss at 13, Second Reply at 4, the District does not point out any deficiencies in the complaint on that score.  Nor does the Court see any with respect to plaintiffs' allegations of past injuries.  Should plaintiffs succeed on the ultimate merits of their case, they would be entitled to a damages award under § 1983 as compensation for "injuries caused by the deprivation of [their] constitutional rights," Carey v. Piphus, 435 U.S. 247, 254 (1978), and "[a] damages award [would] redress[] [their] past injury," Doe 1 v. Apple Inc., No. 21-7135, 2024 WL 925889, at *6 (D.C. Cir. Mar. 5, 2024).

about the Biden administration's response to the COVID-19 pandemic and the withdrawal of troops from Afghanistan.  Id. ¶¶ 22, 26, 35, 44.  In a nutshell then, their claimed injury was not being able to travel by truck into D.C. to protest about two topics of concern.  The District argues that the link between the conduct and injury is broken in two places.

First, the District contends that plaintiffs have not "alleged any plausible connection between their preferred mode of transportation and their planned protest activity."  Second Mot. Dismiss at 13. But they did.  Plaintiffs alleged that "[e]ntering the District via truck was a form of expression" and explained that "due to the media coverage of the previously successful convoy in Canada comprised of Canadian truckers opposing their government's COVID-related policies, it was critical that Plaintiffs also traveled via truck."  Am. Compl. ¶ 25–26.  Entering and protesting *by truck* was thus (arguably) integral to plaintiffs' protest and, as alleged, constituted part of their planned expressive conduct.  See Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984) (assuming, but not deciding, that "overnight sleeping in connection" with a demonstration about the plight of the homeless "is expressive conduct protected to some extent by the First Amendment").  And, given media coverage of the Canadian truckers' convoy—a protest about Canada's COVID-19 policies—a similar convoy in D.C. would be "reasonably understood by the viewer" as communicating opposition to the Biden administration's COVID-19 policies.  Id. at 294 ("[A] message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative.").  Thus, plaintiffs have alleged a link between their mode of transportation and their planned protest.

Second, the District claims that plaintiffs have not alleged that the roadblocks prevented them from entering D.C. because the complaint reflects that they tried to enter the district via only one route each day.  Second Mot. Dismiss at 14–15.  In other words, the blockades did not prevent plaintiffs from entering the District, but rather from using their preferred route.  The Court agrees as

to the March 14 and 15 roadblocks, <u>see also</u> Op. & Order at 6, but the one on March 16 is a somewhat different story.  That day, plaintiffs tried to enter the District via Interstate 695.  Am. Compl. ¶¶ 35–37.  After they encountered a blockade, they asked MPD officers whether "there [was] another way in [to D.C.] other than this exit?"  <u>Id.</u> ¶ 43.  An officer responded, "There is absolutely not—not with your commercial vehicles."  <u>Id.</u>  Because the Court must "accept the well-pleaded factual allegations as true" on a motion to dismiss, the Court will credit this account.  <u>Arpaio</u>, 797 F.3d at 19.[5]  It is also important not to take March 16 out of context.  By that date, plaintiffs had tried, and failed, to enter D.C. via two alternate routes.  Given the officer's statement and their previous unsuccessful attempts, plaintiffs' injury (not being able to enter and protest in D.C. by truck) was "fairly traceable" to the District's conduct (the roadblocks).  <u>Spokeo</u>, 578 U.S. at 338.

In sum, plaintiffs have established standing for the alleged constitutional violations stemming from the March 16 roadblock.

### 2.  *Prospective Relief*

The same cannot be said for their claim to prospective relief.  When they encountered the police barricade on March 16, MPD Sergeant Mahl allegedly told plaintiffs "695 is closed" and then added "my boss is going to eventually tell me to start arresting people, and I don't want to do that."  Am. Compl. ¶ 40.  Plaintiffs believe—based solely on Sergeant Mahl's comment—that, to this day, MPD will arrest them if they try to enter the District.  <u>See id.</u> ¶ 48.  As such, they state they "cannot return" absent injunctive relief or "a promise from MPD that it has changed its position."  <u>Id.</u> ¶ 46.

---

[5]  According to the District, other commercial vehicles were able to enter the District on March 16 and a video of the interaction between MPD officers and plaintiffs shows that an officer identified "several other types of vehicles" plaintiffs "could use to enter the District."  Second Reply at 3–4.  Even assuming those representations are true, the District does not dispute that an officer informed plaintiffs that they could not enter via truck.

But as the Supreme Court has made clear, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013).  That is what plaintiffs seek to do here.  They have inflicted a harm on themselves (staying away from D.C.) based on a harm that is not certainly impending (arrest).  A corollary to this rule is that plaintiffs must show a "realistic danger" that the alleged harm will occur.  Arpaio, 797 F.3d at 21 (cleaned up); see also City of Los Angeles v. Lyons, 461 U.S. 95, 106 n.7 (1983) ("[T]o have a case or controversy with the City that could sustain [a claim for an injunction, the plaintiff] would have to credibly allege that he faced a *realistic* threat from the future application of the City's policy." (emphasis added)).  And plaintiffs have not credibly alleged that Sergeant Mahl's statement, which suggested MPD might arrest plaintiffs if they remained at the Interstate 695 blockade on March 16, 2022, creates a "realistic threat" that they will be arrested if they return to D.C. at any point in the future.  Though plaintiffs may believe the threat of arrest remains, see Second Opp'n, Ex. 1 ¶ 8, "'subjective apprehensions' that such a[n] [o]ccurrence [will] [] take place [are] not enough to support standing." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 184 (2000) (quoting Lyons, 461 U.S. at 107 n.8).

B. Municipal Liability

To state a claim against a municipality under § 1983, "plaintiff[s] must satisfy two requirements: [they] must plead 'a predicate constitutional violation' and that 'a custom or policy of the municipality caused the violation.'" Blue v. District of Columbia, 811 F.3d 14, 18 (D.C. Cir. 2015) (quoting Baker v. District of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003)); see also Monell v. Department of Social Services, 436 U.S. 658, 694 (1978).  Plaintiffs claim the District violated the free speech clause of the First Amendment and the equal protection clauses of the Fifth and Fourteenth Amendments.  Am. Compl. ¶¶ 50–88.  Even assuming plaintiffs adequately pled

constitutional violations, they have failed to allege that a District custom or policy caused the violations.

To allege a municipal policy or custom, a plaintiff "may point to (1) 'the explicit setting of a policy by the government that violates the Constitution,' (2) 'the action of a policy maker within the government,' (3) 'the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become custom,' or (4) 'the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations.'" Blue, 811 F.3d at 19 (quoting Baker, 326 F.3d at 1306) (cleaned up).

The amended complaint does not satisfy any of these theories. Indeed, plaintiffs have not "indicated the contours of any type of municipal policy." Id. at 20; see also id. ("[It] is not [the court's] role . . . [to] try to surmise which theory of municipal liability has the strongest support in the complaint"). Their opposition to the motion to dismiss gestures at the second theory: It claims "statements by the District's policy officers [] . . . prohibited [p]laintiffs from exercising their Free Speech rights." Second Opp'n at 11. And by "policy officers," the Court understands plaintiffs to refer to Sergeant Mahl and perhaps other officers present at Interstate 695 on March 16 as they are the only District employees alleged to have spoken to plaintiffs. See Am. Compl. ¶¶ 40, 43. But "simply labeling a [party] a 'policymaker' does not suffice to state a claim of municipal liability." Jones v. District of Columbia, 715 F. App'x 1, 3 (D.C. Cir. 2018). "Rather, the key element of such a claim is that the relevant official wielded final policy making authority with respect to the allegedly unconstitutional conduct." Id. (cleaned up). And the complaint, in fact, indicates that Sergeant Mahl did not have final policy making authority.[6] He allegedly told plaintiffs "*my boss* is going to

---

[6] Moreover, even if plaintiffs adequately alleged that Sergeant Mahl was a "policy maker," he is alleged to have made comments only about arrests and the closure of Interstate 695, not about the closure of roads to commercial vehicles. Am. Compl. ¶ 40. As such, a theory of municipal liability

eventually tell me to start arresting people." Am. Compl. ¶ 40 (emphasis added).[7] To be charitable to plaintiffs, perhaps they meant to allege that Sergeant Mahl acted as the mouthpiece for his boss, the policymaker. But the amended complaint does not allege that his boss told him to make that comment, was aware he made that comment, or should have been aware.

Moreover, though one might imagine that MPD officers would not erect vehicle barricades without direction from a higher official, the only officers the amended complaint identifies are the ones on Interstate 695. And, as described above, the amended complaint does not allege that those officers wielded "final policy making authority." It is plaintiffs' obligation to "plead sufficient facts to state a claim." Iqbal, 556 U.S. at 687. And where the amended complaint is silent and the Court "can only speculate as to what [plaintiffs] intend[ed] to allege, the Court will not, in effect assume the role of advocate and fill in the gaps left in [plaintiffs'] complaint." Bain v. Off. of Att'y Gen., 648 F. Supp. 3d 19, 29 (D.D.C. 2022) (cleaned up). That is especially so where, as here, plaintiffs have already had an opportunity to amend their complaint and failed to seek leave to amend again once the District pointed out deficiencies in their theory of municipal liability.

Finally, though the amended complaint makes conclusory references to the "District's blockade policy, custom, practice, or procedure," id. ¶¶ 61, 63, these references are no "more than labels [or] conclusions," Twombly, 550 U.S. at 555, and as such do not "clear [the] high hurdle" for

---

tied to his role as a policy maker would at most indicate the existence of a policy of arresting the truck drivers and closing a single highway into D.C. As for the person who allegedly told plaintiffs "[t]here is absolutely not" another way into D.C. for "commercial vehicles," the amended complaint merely labels that person "MPD." Id. ¶ 43. But as the source of that message was a person (the amended complaint describes a "conversation") and not an official press release or statement from the department, the allegations in the complaint do not establish the existence of an official policy regarding vehicle blockades.

[7] The amended complaint describes that Captain Jason Bagshaw was also present with Sergeant Mahl. Am. Compl. ¶ 39. Is Captain Bagshaw Sergeant Bahl's "boss"? See id. ¶ 40. The Court does not know, and the amended complaint makes no allegations to that effect.

alleging municipal liability, <u>Page v. Mancuso</u>, 999 F. Supp. 2d 269, 284 (D.D.C. 2013); <u>see also</u> <u>id.</u> ("When a plaintiff seeks to establish 'custom and policy' municipal liability under § 1983 in the absence of an express policy, she must allege 'concentrated, fully packed, precisely delineated scenarios' as proof that an unconstitutional policy or custom exists." (quoting <u>Parker v. District of Columbia</u>, 850 F.2d 708, 712 (D.C. Cir. 1988))).

Thus, even assuming plaintiffs adequately alleged violations of their constitutional rights, they have failed to allege that a municipal policy of the District caused those violations.

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss in full.  A separate Order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>March 20, 2024</u>